UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

MPAY Inc.,                                    File No. 19-cv-704 (ECT/LIB)

      Plaintiff,

v.                                            **OPINION AND ORDER**

Erie Custom Computer Applications, Inc.;
PayDay USA, Inc.; Payroll World, Inc.;
Proliant, Inc.; Proliant Technologies, Inc.;
and Kevin Clayton,

      Defendants.

---

Amanda Phillips, Robinson & Cole LLP, Boston, MA; Andrew J. Pieper, Stoel Rives LLP, Minneapolis, MN; Benjamin Daniels and John Cordani, Robinson & Cole LLP, Hartford, CT; Janet Kljyan, Robinson & Cole LLP, New York, NY; John T. Gutkoski, Cesari and McKenna, LLP, Boston, MA; and Scott Magee, Morse Barnes-Brown & Pendleton, PC, Waltham, MA, for Plaintiff MPAY, Inc.

Benjamen C. Linden, Christopher K. Larus, David Allen Prange, Emily Jean Tremblay, and Rajin Olson, Robins Kaplan LLP, Minneapolis, MN; Jon B. Miller, Miller Johnson Law, San Diego, CA; and Kevin C. Young, Law Offices of Kevin C. Young, San Diego, CA, for Defendants Erie Custom Computer Applications, Inc., and Payroll World, Inc.

Corrin Drakulich, Fish & Richardson P.C., Atlanta, GA; Excylyn Hardin-Smith, Fish & Richardson, New York, NY; Michael E. Florey, Fish & Richardson PC, Minneapolis, MN; and Robert Rickman, Mayer LLP, Dallas, TX, for Defendants PayDay USA, Inc., Proliant, Inc., Proliant Technologies, Inc., and Kevin Clayton.

---

     In June 2022, after a seven-day trial and more than three years into this case, the jury determined that Plaintiff MPAY Inc. had not established its claim that defendants Erie Custom Computer Applications, Inc. and Payroll World, Inc., breached the parties' agreements regarding source code for payroll-processing software. Without any breach,

MPAY could not establish its related copyright infringement claims as a matter of law, and judgment was entered in favor of the defendants on all claims.  MPAY now renews the motion for judgment as a matter of law it made at the close of evidence and also moves for a new trial.  All defendants, including formerly dismissed defendants PayDay USA, Inc., Proliant, Inc., and Proliant Technologies, Inc. (collectively, "Proliant"), and Kevin Clayton, ask for their attorney fees.

I[1]

Briefly described, the parties' dispute centers on a venture between MPAY and the defendant entities called OnePoint Solutions, LLC.  OnePoint's purpose was to license MPAY's payroll-processing software, both for the entities' use and for further development.  To that end, the parties executed a Member Control Agreement ("MCA") for OnePoint, Pl.'s Ex. 1, and a Software Development and License Agreement ("SDLA") between MPAY and OnePoint. *Id.* Ex. 4.  These agreements gave OnePoint and its members the right to use, sublicense, and update MPAY's software.  MCA §§ 5.1, 5.4; SDLA § 2(a).

This is not the first time the parties have found themselves in court disputing these agreements' requirements.[2]  In 2007, the parties settled one of their previous federal lawsuits in what they term a "Mediated Settlement Agreement."  Pl.'s Ex. 6. This

---

[1]    The facts are described in detail in several previous orders, and this order presumes familiarity with those facts.

[2]    The parties are also involved in an ongoing state-court case in which MPAY seeks to dissolve OnePoint.  *MPAY Inc. v. OnePoint Sols., LLC*, No. 27-CV-19-4069 (Minn. 4th Jud. Dist.).

agreement extinguished most of OnePoint's obligations under the SDLA, except the obligation to pay per-check royalties and other obligations not relevant to this case.

As initially framed, MPAY centered this case on the claim that the defendants breached the MCA by providing MPAY's source code to developers that were not allowed to possess it.  Am. Compl. [ECF No. 17] ¶¶ 39, 57.  After the Eighth Circuit Court of Appeals rejected that claim, *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1017–18 (8th Cir. 2020), MPAY pursued the theory that it took to trial:  that defendants licensed the software in violation of the MCA, which only allows such licensing to entities in which a defendant owns a majority stake and voting control.  MCA § 5.4.

Much of the trial centered on § 5.4 of the MCA, because defendants claimed to have amended this provision in 2016 to allow them to sublicense the software to whomever they chose.  The parties put on extensive evidence regarding the original agreement and the amendment to it.  MPAY described in detail Erie and Payroll World's involvement in two other companies, Starr-Lee and Taslar, that MPAY believed were inappropriately granted sublicenses under the MCA.  MPAY also argued to the jury that ten of MPAY's customers left MPAY as a result of the defendants' conduct.  Erie and Payroll World submitted a vigorous defense to all of MPAY's contentions.  After seven trial days, the jury reached a verdict in approximately two hours, finding that Erie and Payroll World had not breached the MCA.

## II

MPAY seeks to set aside this verdict.  MPAY argues that a new trial is warranted because jury instruction 20 was factually and legally improper.  This instruction stated that

MPAY's copyright infringement claims and tortious interference claims "depend on MPAY's claim that Erie and/or Payroll World breached the [MCA]." ECF No. 760 at 25. Accordingly, the verdict form required the jury to determine first whether the defendants breached the parties' agreement. ECF No. 764. The verdict form provided that if there was no breach, the jury need not make any further determinations on MPAY's claims. *Id.* The jury found that there had been no breach and thus did not answer any other questions on the verdict form. *Id.* MPAY argues that instruction 20 was erroneous because MPAY's copyright and breach-of-contract claims are not coextensive. In MPAY's view, the jury could have found copyright infringement even if it found that Erie and Payroll World did not breach the parties' agreements. MPAY also contends that the grant of judgment as a matter of law on certain theories of its tortious interference claim was erroneous and warrants a new trial.

In evaluating a motion for a new trial under Rule 59(a), "[t]he key question is whether a new trial should [be] granted to avoid a miscarriage of justice." *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1400 (8th Cir. 1984). "In determining whether or not to grant a new trial, a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir. 1992). The "trial judge may not usurp the functions of a jury." *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992) (citation and quotation marks omitted). "Rather, the trial court must believe . . . that the verdict was so contrary to the evidence as to amount to a miscarriage of justice." *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996).

According to MPAY, instruction 20 was erroneous because the jury could have found copyright infringement even if it did not find any breach of contract. A new trial on the basis of erroneous jury instructions is warranted only if the instruction "affected a party's substantial rights," or "when the error[] misled the jury or had a probable effect on the jury's verdict. *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006). The ultimate question is "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and accurately submitted the issues to the jury." *Id.*

A copyright licensee may be liable for infringement if its use of the copyrighted material exceeds the scope of that license. *See Fairview Health Servs. v. Quest Software, Inc.*, No. 20-cv-1326 (SRN/LIB), 2021 WL 679260, at *7 (D. Minn. Feb. 22, 2021) (A "copyright owner may recover for infringement if . . . the copying exceed[s] the scope of the defendant's license . . . .") (cleaned up). MPAY argues that the challenged sublicenses exceeded the scope of the original license, and thus that copyright law required the defendants to secure MPAY's affirmative consent to that sublicensing. Because they did not have MPAY's consent, the sublicenses violated MPAY's copyrights. *See* ECF No. 820 at 7–8 (citing, inter alia, *Crispin v. Christian Audigier, Inc.*, 839 F. Supp. 2d 1086 (C.D. Cal. 2011)).

MPAY's heavy reliance on *Crispin* is misplaced. In *Crispin*, the parties had an alleged oral or implied agreement regarding the defendant's license to use the plaintiff's copyrighted works. *Crispin*, 839 F. Supp. 2d at 1092. Because the license at issue was not evidenced in any writing, the parties disputed whether that license permitted sublicensing.

*Id.* at 1094. The *Crispin* court held that copyright law requires the copyright holder's express permission for sublicensing, and that the parties' dispute over whether such express permission existed created a triable issue of fact, making summary judgment inappropriate. *Id.* at 1096.

There is no implied or oral license at issue in this case. Rather, there is a written agreement that unambiguously contemplates sublicensing. The jury could have reasonably found that the sublicensing at issue did not exceed the scope of the original license because MPAY agreed in § 5.4 of the MCA that the defendants could sublicense the software. MPAY argues that it did not consent to the specific sublicensing that occurred, but MPAY also consented to the amendment of the MCA by two-thirds of the Class L units. MCA Art. 13. Erie and Payroll World proffered evidence that they amended § 5.4 pursuant to Article 13 to allow broader sublicensing than original § 5.4 allowed, and the sublicensing MPAY challenges is permitted under the terms of amended § 5.4. MPAY argued to the jury that the amendment process did not comply with the MCA's requirement, but the jury was not required to credit MPAY's evidence on this, or any other, point. MPAY also argued that the amended section did not apply to at least some of the sublicenses that were executed before the amendment's enactment. The defendants proffered contrary evidence that the amendment had been backdated so that all sublicenses were valid. In the jury's view, Erie and Payroll World's sublicenses to Taslar and other entities did not exceed the scope of the parties' agreement. This finding necessarily means that there was no copyright infringement.

MPAY's other theories of how the jury might have found copyright infringement in the absence of a breach of contract fare no better. If the jury found that the defendants' amendment of § 5.4 fell within the scope of the MCA's exculpation clause, MCA Article 6, then the amendment would be valid, and the sublicensing accomplished pursuant to it would not violate MPAY's copyrights. MPAY's contention regarding the differences in the causation required for a breach of contract claim and that required for a copyright claim has no bearing on whether MPAY could maintain a copyright claim in the absence of its breach claim. At bottom, this argument repackages MPAY's insistence that the jury could find copyright infringement without finding a breach of contract, but the discussion above forecloses that contention. MPAY has not established either that the alleged errors affected its substantial rights or misled the jury, and the motion for a new trial is denied.

MPAY also asserts that the jury should have been allowed to consider MPAY's tortious interference claim even in the absence of any finding of copyright infringement. But tortious interference requires some independently tortious activity. In other words, a claim for tortious interference requires an improper means, which are "those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade *or any other wrongful act recognized by statute or common law*." *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1137 (D. Minn. 2016) (quoting *Harman v. Heartland Food Co.*, 614 N.W.2d 236, 241 (Minn. Ct. App. 2000)) (emphasis added). Tortious interference does not arise out of thin air. A plaintiff claiming tortious interference must show something—some tort or other independently wrongful conduct amounting to a tort—that underlies the claim. When

pressed to do so, MPAY identified no basis for its tortious interference claim other than copyright infringement.  It was not erroneous to refuse MPAY's request to ask the jury to reach a verdict on the tortious interference claim in the absence of another underlying tort.

III

MPAY moved for judgment as a matter of law at the close of the evidence and renews that motion under Fed. R. Civ. P. 50(b).  MPAY claims that the evidence did not support the jury's determination that Erie and Payroll World did not breach the parties' contract.  MPAY offers four alternative theories for how this could be so: (1) that the evidence was insufficient to allow the jury to conclude that defendants properly amended the MCA to allow the challenged sublicensing; (2) even if the MCA was properly amended, the sublicensing to two entities happened before the purported amendment; (3) regardless of the validity of the purported amendment, the sublicenses to Taslar and what MPAY calls 10 "lost" customers infringed MPAY's copyrights; and (4) the MCA's exculpatory clause does not apply and that there was no evidence of MPAY's waiver with regard to the sublicense to Starr-Lee.

A Rule 50 motion succeeds only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).  A court reviewing such a motion must view the facts in the light most favorable to the nonmoving party and grant the nonmoving party the benefit of all reasonable inferences. *Canny v. Dr. Pepper/Seven-Up Bottling Grp.*, 439 F.3d 894, 899-900 (8th Cir. 2006).  The Rule 50 standard is a high one, requiring that "all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving

8

party." *Howard v. Mo. Bone & Joint Ctr.*, 615 F.3d 991, 995 (8th Cir. 2010) (citation and quotation marks omitted).  MPAY has not met that burden here.

MPAY first argues that the jury could not reasonably find that the defendants properly amended § 5.4, because as a matter of law the amendment affected MPAY's substantial rights and thus under Article 13 required MPAY's approval.  Previous rulings in this case established that the terms of the contracts were ambiguous, and it was thus the province of the jury to interpret the MCA's terms.  *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003) ("The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact for the jury.") (internal citation omitted).  The defendants proffered evidence that MPAY's rights were limited to only the rights enumerated in § 1.10 of the MCA, and that those rights were not affected by the amendment to § 5.4.  MPAY proffered evidence that its rights were not limited to § 1.10 and that its rights were affected by the amendment.  The jury reasonably could have credited the defendants' evidence on this point.

MPAY next contends that even if its rights were only those set forth in § 1.10, the purported amendment to § 5.4 of the MCA materially and adversely affected MPAY's rights as a matter of law because it would affect MPAY's right of distribution from a sale or dissolution of OnePoint.  But, as with the prior argument, previous orders established that this was a question of fact for the jury.  And while MPAY presented evidence and argued that the amendment adversely affected its right of distribution, Erie and Payroll World presented evidence and argued that this "right" was purely speculative and that the allegedly unauthorized sublicenses did not affect it in any event.  The jury properly

9

weighed that evidence and determined that the defendants did not breach the MCA. Judgment as a matter of law is not appropriate.

The same is true for MPAY's argument that the sublicenses to Taslar and the 10 "lost" customers breached the original § 5.4 as a matter of law.  The parties presented evidence on this issue and the jury determined that no breach occurred.  And the jury likewise heard evidence regarding the two sublicensees whose sublicenses predated the amendment to § 5.4, including the defendants' evidence that the amendment was backdated to a date before these sublicenses issued.  The jury clearly concluded that these sublicenses did not breach the parties' agreements, a conclusion that is sufficiently supported by the evidence.

MPAY's related argument that the defendants infringed MPAY's copyright by sublicensing the software in breach of the MCA's sublicensing provision is similarly without merit.  The jury found that the defendants' conduct did not breach the MCA; as a result, the defendants did not exceed the scope of MPAY's license and there was no copyright infringement. MPAY is not entitled to a judgment as a matter of law on its copyright claims, nor is it entitled to a permanent injunction prohibiting any alleged infringing activity on the defendants' part.  To the extent that MPAY argues that it could establish copyright infringement even if the defendants did not breach the MCA, this argument is addressed, and rejected, in conjunction with MPAY's motion for a new trial above.

Next, MPAY contends that the exculpatory clause, Article 6 of the MCA, does not apply here, and that even if it does, it cannot exculpate the defendants' copyright

infringement.  MPAY's argument is that the exculpatory clause applies only if OnePoint's members are acting "in connection with the conduct of the business of the company," MCA Art. 6, and no reasonable jury could have found that Erie and Payroll World were doing so in sublicensing the software to Taslar and the other entities.  This argument repeats the rejected contention that the contract was unambiguous and should have been construed as a matter of law.  Given the MCA's ambiguity, the jury heard evidence from both sides and properly determined that there was no breach, whether based on the amendment, the exculpatory clause, or for some other reason.

Lastly, MPAY argues that the defendants' waiver defense fails as a matter of law. Again, because the contract's terms were ambiguous, the jury was required to determine what each disputed clause meant.  MPAY put on evidence that there was no waiver; Erie and Payroll World put on competing evidence.  The jury's determination that there was no breach of contract is not unreasonable and will not be disturbed.

IV

Both Erie/Payroll World and the previously dismissed Proliant defendants have moved for attorney's fees.  All defendants contend that that the SDLA mandates and the Copyright Act supports their claims to attorney's fees.  Erie and Payroll World ask for more than $4 million in fees; the Proliant defendants seek just under $1.2 million.

A

The defendants argue that the SDLA mandates the award of fees.  The relevant provision in the SDLA reads as follows:

11

> If either Party employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing Party (as determined by a court or in an arbitration) shall be entitled to recover its reasonable costs and attorneys' fees from the other Party.

SDLA, Pl.'s Ex. 4 § 12(b).  The SDLA defines "Party" as either MPAY or OnePoint; "Members" like Erie, Payroll World, and Proliant are defined and discussed separately. *See id.* at p.1 (opening paragraph of SDLA stating, "Licensee [OnePoint] and Licensor [MPAY] are each referred to individually as a 'Party' and collectively as 'Parties'"). According to the defendants, because they are in privity with OnePoint or are intended third-party beneficiaries of the SDLA, the fee-shifting provision applies to them.

The reliance on the SDLA is misplaced for two reasons.  First, throughout this litigation, the defendants have argued, and previous decisions have noted, that the SDLA essentially ceased to exist after the 2007 Mediated Settlement Agreement.  The defendants' argument that the SDLA was no longer in force bolstered the conclusion on summary judgment that MPAY's source-code claims had no merit.  ECF No. 532 at 8.  The defendants' invocation of the SDLA as support for their requests for fees runs counter to their previous arguments and the court's previous rulings.

At the hearing on these motions, Erie and Payroll World argued that the Mediated Settlement Agreement only released the parties' "obligations" under the SDLA, and that the fee-shifting provision is not an "obligation."  This contention is not persuasive.  A contractual term requiring one party to pay another party's attorney's fees is undoubtedly an obligation under any sense of the word.  *Obligation*, *Black's Law Dictionary* (11th ed.

2019) ("A legal or moral duty to do or not do something.").  Moreover, the Mediated

Settlement Agreement's cancellation of the SDLA is evident from its broad language:

> As of the Termination Date, *all obligations between the parties*, including all obligations arising out of the Agreement, shall cease, except for (a) the continuing obligation of OnePoint to pay the $.02/check license fee under section 3(b) of the Agreement; (b) the continuing defense and indemnity obligations of OnePoint . . . ; and (c) the parties' rights and obligations under the OnePoint, LLC Member Control Agreement.

MSA ¶ 6 (emphasis added).  This language unambiguously evidences the parties' intent

that the SDLA would essentially cease to exist, and the parties' relationship would

thereafter be governed solely by the MCA.

Even if the SDLA's fee-shifting provision continued to apply, however, the

defendants have failed to demonstrate that they were either in privity with OnePoint for

purposes of the SDLA or that they were intended third-party beneficiaries of the SDLA.

They rely on two unpublished decisions in the same case for their arguments in this regard,

but those decisions are not on point.  *See Windsor Craft Sales, LLC v. VICEM Yat Sanayi

ve Ticaret AS*, No. 10-cv-297 (ADM/JJG), 2012 WL 3776462 (D. Minn. Aug. 30, 2012).

In *Windsor Craft*, a contract provided a broad warranty for yachts the defendant

agreed to build for a distributor.  *Windsor Craft Sales, LLC v. VICEM Yat Sanayi ve Ticaret

AS*, No. 10-cv-297 (ADM/JJG), 2010 WL 4025077, at *1 (D. Minn. Oct. 13, 2010).  The

distributor thereafter entered into a second-level distribution contract with one of the two

plaintiffs, with a contract that expressly incorporated the initial distribution contract,

including that contract's warranty.  *Id.*  That plaintiff/distributor then entered into a dealer

agreement with the other plaintiff, which purchased a yacht but found manufacturing defects and workmanship defects in the boat. *Id.* The two plaintiffs then sued the defendant manufacturer under the warranty in the initial agreement.

Early in the case, the presiding judge found that the second-level distributor plaintiff was in privity with the initial contracting parties because the initial agreement contemplated multiple "authorized dealers" and the second contract incorporated the warranty from the initial agreement. *Id.* at \*4. In addition, the contract contained a broad indemnity clause requiring the manufacturer to indemnify not only its initial contract partner, but also that party's "subcontractors, licensees, assigns, and customers." *Id.* Because there was no dispute that the plaintiff distributor was a subcontractor of the initial contracting party, that plaintiff clearly had rights in the contract. *Id.* at \*5. The court likewise determined that the plaintiff dealer was a third-party beneficiary of the initial agreement based on the same contract language. *Id.*

After the plaintiffs prevailed at trial, the court applied the fee-shifting provision from the initial agreement to require the defendant to pay the plaintiffs' attorney's fees. *Windsor Craft Sales*, 2012 WL 3776462, at \* 8. This provision applied to the plaintiffs because, as previously determined, they were in privity with the initial signors to the agreement or were third-party beneficiaries of it. *Id.*

The defendants argue that this case is akin to *Windsor Craft Sales* because the SDLA requires MPAY to indemnify both OnePoint and its "Members," thus creating rights in the SDLA in favor of Erie and Payroll World. SDLA § 6(b). They further note that the SDLA creates obligations on the part of Erie and Payroll World, such as the obligation to pay per-

14

check royalties to MPAY.  *Id.* § 3(b).  According to the defendants, they "performed as parties" under the SDLA.  ECF No. 813 at 11 (alteration and quotation omitted).  They alternatively argue that they are intended third-party beneficiaries under the SDLA for the same reasons, again relying on the *Windsor Craft Sales* decisions.

But the plain language of the SDLA's attorney-fee provision contemplates only that "either Party," not any "Member," is entitled to reimbursement of its fees.  Only OnePoint and MPAY are "Parties" under the SDLA.  This is not a situation like *Windsor Craft Sales*, where multiple provisions contemplated that the parties' obligations would apply to other, unnamed parties.  The fee-shifting provision is freestanding and provides that it applies only to the "Parties."  Under the plain terms of the SDLA, fees are not available to non-parties.

## B

The Copyright Act allows, but does not mandate, an award of attorney's fees "to the prevailing party" in a copyright action.  17 U.S.C. § 505.  The discretion to award fees must be "exercised in an evenhanded manner by considering factors such as whether the lawsuit was frivolous or unreasonable, the losing litigant's motivations, the need in a particular case to compensate or deter, and the purposes of the Copyright Act."  *Killer Joe Nevada, LLC v. Does 1-20*, 807 F.3d 908, 911 (8th Cir. 2015) (quoting *Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1014 (8th Cir. 2006)).  Thus, "a district court may not 'award[] attorney's fees as a matter of course'; rather, a court must make a more particularized, case-by-case assessment."  *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994)).  "Although [the] objective

15

reasonableness [factor] carries significant weight, courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals." *Kirtsaeng*, 579 U.S. at 209. Thus, the mere fact that a party's position is or is not objectively reasonable is not dispositive in the fee-shifting analysis, but denial of fees may be justified by "a losing plaintiff's good faith in bringing a colorable claim." *Hardman v. Hallmark Cards, Inc.*, 833 F.2d 117, 122 (8th Cir. 1987).

The goal of the Copyright Act is to "enrich[] the general public through access to creative works." *Fogerty*, 510 U.S. at 527. "The statute achieves that end by striking a balance between two subsidiary aims: encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng*, 579 U.S. at 204. "[F]ee awards under § 505 should encourage the types of lawsuits that promote those purposes." *Id.* If an award of attorney's fees is appropriate, the Eighth Circuit applies the lodestar method to calculate a reasonable fee. *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294 (8th Cir. 1996).

1

Erie and Payroll World contend that fees are warranted under the Copyright Act because MPAY's claim of copyright infringement was untenable from the outset of the case. Proliant and Mr. Clayton make a slightly different argument. They contend that MPAY's continued prosecution of its claims against them after August 2020—when the Eighth Circuit rejected the source-code theory, and when discovery ostensibly established Clayton and Proliant's lack of knowledge of Erie and Payroll World's alleged infringement—was unreasonable and warrants an award of fees they expended after that point.

Erie and Payroll World will not be awarded their attorney fees under the Copyright Act. MPAY's claims against these defendants were not frivolous or objectively unreasonable. Many of MPAY's claims survived summary judgment and the defendants' motion for judgment as a matter of law at the close of evidence, demonstrating that genuine issues of fact required resolution on those claims. And given the highly specific nature of the claims and defenses in this case, the award of fees would not advance the Act's purpose to protect creative works while encouraging the proper use of such works. *Kirtsaeng*, 579 U.S. at 204.

## 2

### a

Whether Proliant and Clayton are entitled to their fees under the Copyright Act is a different and close question. Start with the fact that these defendants seek fees only from the Eighth Circuit's ruling on MPAY's request for a preliminary injunction in August 2020. At that point, Proliant and Clayton argue, MPAY knew that its contract claim—what the parties call the independent-software-developer claim—had no legal basis. The Eighth Circuit said as much: the defendants "demonstrated that their copying, disclosure, and possession of the source code were authorized by the Software Development and License Agreement." *MPAY*, 970 F.3d at 1019. According to Proliant and Clayton, because the only claim MPAY raised against them was the independent-developer claim, MPAY should have dismissed the lawsuit as to them at this point. MPAY's failure to do so, they say, was unreasonable.

17

MPAY makes two separate arguments in opposition to this contention.  First, MPAY contends that its contract claim was not its only claim against Proliant and Clayton—it also asserted that Proliant and Clayton were contributorily or vicariously liable for Erie and Payroll World's alleged infringement.  But both of these infringement theories are directly tied to the independent-software-developer claim.  MPAY contended that, by doing what the contracts allowed the defendants to do, they were infringing MPAY's copyrights, either directly or indirectly.  MPAY had no evidence, and made no claim, that Proliant and Clayton had any role in the other type of alleged infringement, Erie and Payroll World's alleged improper sublicensing of the software.

MPAY's second reason for not dismissing its claims against Proliant and Clayton is evidentiary.  According to MPAY, the Court of Appeals' decision was preliminary, and it was entitled to take discovery on the veracity of the defendants' denials.  But MPAY fails to recognize that the preliminary-injunction determination, while made early in the case, was a legal determination that MPAY's main theory regarding the defendants' allegedly improper use and distribution of the source code was contrary to the contracts' plain language.  There was no factual ambiguity here: both the district court and the appeals court told MPAY that the contracts allowed the defendants to do what they did to develop the software, no matter how MPAY packaged that claim.  That MPAY refused to abandon that claim is unreasonable.

Even if MPAY was correct, however, that the original preliminary-injunction denial was based on an incomplete record, by the time the court of appeals affirmed that denial, MPAY had taken Clayton's deposition.  In that deposition, he denied knowing anything

18

about Taslar.  Clayton Dep. [ECF No. 129-4] at 104–05.  MPAY had no evidence to the contrary.  Nor is the original denial of Proliant and Clayton's motion for judgment on the pleadings evidence that MPAY's claims deserved further evidentiary development.  At that hearing, MPAY insisted that it needed further discovery, not to determine whether Clayton or Proliant was involved in Erie and Payroll World's activities, but to "find out what the details are regarding their supposed retention and actions as independent software developers as opposed to the members who are supposed to benefit from that development."  ECF No. 346 at 20–21.  The only discovery MPAY sought was related to the rejected independent-software-developer claim, not the sublicensing claim.

Finally, MPAY's insistence now that Clayton's signature on the MCA amendment breached his fiduciary duty and somehow allowed MPAY to continue to pursue its claims against him, ECF No. 846 at 17, is directly contrary to MPAY's argument to the jury.  In her closing argument, MPAY's counsel told the jury that Erie and Payroll World "tricked" Clayton into signing the MCA amendment.  ECF No. 777 at 1580.  MPAY cannot have it both ways.

MPAY's insistence on maintaining its claims against Proliant and Clayton despite clear guidance from this court and the court of appeals that those claims were without legal basis was unreasonable.  This determination does not necessarily mean that Proliant and Clayton are entitled to the attorney's fees they amassed after that point, but it is an important piece of that decision.  *See Kirtsaeng*, 579 U.S. at 209.

In *Kirtsaeng*, the Supreme Court emphasized that the award of attorney fees should reflect the goals of the Copyright Act, which are not only to encourage and reward authors

but to enable others to build on that work.  *Id.*  MPAY's continued pursuit of its claims

against Proliant and Clayton was intended to stymie these defendants' ability to build on

MPAY's work, as the parties' agreements expressly allowed them to do.  Attorney fees are

warranted as to Proliant and Clayton to further the Act's express purposes.

b

Having determined that Proliant and Clayton are entitled to recoup the attorney fees

billed after the court of appeals' decision in August 2020, the next question is whether the

fees sought are reasonable.  To evaluate this question, the court may consider any or all of

the following factors:

> (1) the time and labor required; (2) the novelty and difficulty
> of the question; (3) the skill requisite to perform the legal
> service properly; (4) the preclusion of employment by the
> attorney due to acceptance of the case; (5) the customary fee;
> (6) whether the fee is fixed or contingent; (7) time limitations
> imposed by the client or the circumstances; (8) the amount
> involved and the results obtained; (9) the experience,
> reputation and ability of the attorney; (10) the "undesirability"
> of the case; (11) the nature and length of the professional
> relationship with the client; and (12) awards in similar cases.

*Adventure Creative Grp., Inc. v. CVSL, Inc.*, 412 F. Supp. 3d 1065, 1074 (D. Minn. 2019).

The fee is calculated by multiplying the number of hours reasonably expended times a

reasonable hourly rate; the resulting total is presumed reasonable, subject to adjustment

based on the factors listed above.  *Id.*

MPAY's first objection to the fees sought is that the hourly rate Proliant's and

Clayton's attorneys charged is too high.  "Generally, to determine whether an hourly rate

is reasonable, courts look at the rates 'prevailing in the community for similar services by

20

lawyers of reasonably comparable skill, experience and reputation.'" *In re RFC*, 399 F. Supp. 3d 827, 846 (D. Minn. 2019) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). But "where particular legal specialization is required, courts may consider a national billing rate." *Id.* (citing *Casey v. City of Cabool, Mo.*, 12 F.3d 799, 805 (8th Cir. 1993)[3]). Proliant and Clayton acknowledge that the rates their attorneys charge are significantly higher than the rates attorneys in the Twin Cities charge for similar work but contend that the rates are justified by counsel's expertise and national reputation.

In the Eighth Circuit, however, in the absence of a particular need for counsel with national reach, "'a reasonable hourly rate is usually the ordinary rate for similar work in the community where the case has been litigated[ ]' unless 'the [party seeking fees] has shown that, in spite of his diligent, good faith efforts, he was unable to find local counsel able and willing to take the case.'" *Pederson v. Kesner*, No. 21-cv-2256 (ECT/DTS), 2022 WL 4080686, at *6 (D. Minn. Sept. 6, 2022) (quoting *Emery v. Hunt*, 272 F.3d 1042, 1048 (8th Cir. 2001)). This case involved relatively non-complex commercial copyright, trade-secret, and contract issues that did not require attorney specialists not found in the Twin Cities. Erie and Payroll World used the services of a local law firm to great success. And while Proliant and Clayton point to a single case approving an $880 hourly rate for a local attorney, that case was the settlement of a complex class action, not the awarding of fees

---

[3]     In *Casey*, the court of appeals was concerned with ensuring that civil rights plaintiffs were not limited to seeking attorneys with below-market billing rates, as that would "relegate civil rights enforcement (and the law that results)" to lawyers who were inexperienced or, potentially, incompetent. *Casey*, 12 F.3d at 805.

under the Copyright Act. *Roeser v. Best Buy Co., Inc.*, No. 13-cr-1968 (JRT/HB), 2015 WL 4094052, at *12 (D. Minn. July 7, 2015). Moreover, $880 per hour—for an attorney with significant legal experience—is only slightly higher than the lowest rate Fish & Richardson charges for its partners. *See* Drakulich Aff. [ECF No. 839] ¶ 14. Even when national counsel is necessary, the rates at which such counsel are compensated are well below those sought here. *See In re RFC*, 399 F. Supp. 3d at 848, 850 (approving rate of $675 per hour for national counsel in case described as "the most factually and legal complicated case" the underlying bankruptcy-court judge had overseen).

MPAY has submitted evidence that Fish & Richardson's partner billing rates are approximately 30% higher than rates at comparable firms in the Twin Cities, and in the undersigned's experience, MPAY's evidence is credible and reasonably accurate. The fees sought, if otherwise reasonably expended, will therefore be reduced by 30% to account for the difference in Fish & Richardson's rates and the rates prevailing in this community.

With one exception discussed below, MPAY does not take issue with the number of hours Fish & Richardson expended in litigating this matter. Rather, MPAY contends that certain categories of fees are not compensable: those related to the transition from Proliant's and Clayton's original counsel to Fish & Richardson, fees for administrative tasks, and fees for work on the parallel state-court lawsuit. MPAY also asserts that Fish & Richardson's block billing makes evaluation of the propriety of the hours expended impossible and asks that the hours be discounted as a result.

MPAY argues that fees for the transition from the law firm that represented Proliant initially to Fish & Richardson should be excluded, implying that such fees are always non-

compensable.  But the case on which MPAY relies for this proposition is not on point.

*Transcon. Ins. Co. v. Stock Roofing, Inc.*, No. 04-cv-5125 (RHK/JSM), 2006 WL 8445344

(D. Minn. May 31, 2006).  In that case, the Magistrate Judge sanctioned a party for

frivolously opposing a motion to amend.  She determined, however, that some aspects of

the fees sought were not compensable, including, "getting up to speed on this Court's local

rules and procedures."  *Id.* at *2.  This is a far cry from a firm joining hard-fought litigation

mid-stream and requiring time to learn about the case.  The hours Proliant and Clayton

seek for the transition are reasonable and will not be excluded.

Fish & Richardson billed nearly $70,000 for what it categorizes as "ministerial"

tasks.  Such tasks include

> identifying deadlines and making sure a team member was
> assigned to meet those deadlines, answering questions from
> team members about projects and assignments, scheduling
> meet and confer sessions with opposing counsel, reviewing
> correspondence from opposing counsel and coordinating
> responses, coordinating division of labor with co-counsel on
> common issues, and coordinating with clients and other
> witnesses as to the timing of depositions and declarations.

Drakulich Aff. ¶ 6.b.  MPAY contends that it is improper for Proliant and Clayton to

recover for such "ministerial" tasks, citing three cases in support of that argument.  But

those cases stand for the proposition that "clerical," not "ministerial," tasks, are not

properly accounted for at an attorney or paralegal rate.  *See Rosen v. Wentworth*, 13 F.

Supp. 3d 944, 952–53 (D. Minn. 2014) (finding "hours for tasks such as printing

documents, mailing letters, and collating files" not compensable at attorney or paralegal

rates); *see also MacGregor v. Mallinckrodt, Inc.*, No. 01-cv-828 (DSD/SRN), 2003 WL

23335194, at *13 (D. Minn. July 21, 2003) ("[C]lerical duties do not justify attorney and paralegal rates."); *Taylor v. City of Amboy*, No. 14-cv-722 (PJS/TNL), 2017 WL 4075163, at *5 (D. Minn. Sept. 14, 2017) (same). The tasks described in the billing records are case-coordination matters that are appropriately performed by lawyers and properly compensable at attorney rates.

Fish & Richardson billed just over $900,000 for discovery, but seeks only 50% of this amount, because much of the discovery in this case was also relevant to the pending state-court litigation. MPAY's objection to this is that counsel improperly included work performed in another case in its bills for this matter, but that objection is the reason counsel discounted the fees in this category by fifty percent. MPAY also asserts that block billing makes it difficult to discern what tasks were performed for the state case and what tasks were performed for this matter, "mak[ing] it impossible to verify this allocation." ECF No. 846 at 40. As discussed below, however, Fish & Richardson did not engage in impermissible block billing, and it is reasonable to split discovery costs 50/50 between two pending matters.

MPAY requests that the total fee award be reduced because of ostensible "block billing," in which the timekeeper performs multiple tasks in a single billing "block." But the decisions reducing fees for block billing do not involve facts akin to Fish & Richardson's bills here. In one case on which MPAY relies, the court reduced the fees sought for egregiously vague block billing in which the timekeepers did not sufficiently describe the tasks performed. *Lamplighter Vill. Apartments LLP v. City of St. Paul*, No 21-cv-413 (PAM/HB), 2021 WL 5888532, at *2 (D. Minn. Dec. 13, 2021). Fish &

Richardson's time entries are not vague.  That many time entries in this case encompass more than one task reflects not inattention but the nature of the case the attorneys were litigating and the varied tasks required to undertake that litigation.  The hours will not be reduced for block billing.

Finally, it deserves mention that the fees Proliant and Clayton seek are small relative to the damages MPAY demanded from them.  MPAY's claimed damages included all of Proliant's profits since 2010—more than $242 million—and $25 million from Clayton personally.  ECF No. 570 at 28; ECF No. 505-2 at ECF pp. 2, 4.  Perhaps as a result of this "bet the company" damages demand, this litigation was exceedingly hard-fought, and the hours Proliant and Clayton's attorneys billed are not out of proportion to the intensity of the litigation.  *See Am. Mod. Home Ins. Co. v. Thomas*, No. 4:16cv215 CDP, 2019 WL 3976355, at *4 (E.D. Mo. Aug. 22, 2019) (noting that defendants had "no choice but to meet [plaintiff's] intensity, whether it be preparing for and defending dozens of depositions; litigating several (and in some instances repeated) discovery disputes . . .; preparing for and attending court-ordered hearings; and briefing several summary judgment and *Daubert* motions").  The hours expended are reasonable, and with a 30% reduction, the rates requested are also reasonable.  Proliant and Clayton are entitled to attorney's fees of $823,660.94.[4]

---

[4]     These defendants sought a total of $1,176,658.49 in fees.  Thirty percent of this amount is $352,997.55, which subtracted from $1,176,658.49 yields $823,660.94.

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

1.    Plaintiff MPAY Inc.'s Renewed Motion for Judgment as a Matter of Law

[ECF No. 788] is **DENIED**.

2.    Plaintiff MPAY Inc.'s Motion for New Trial [ECF No. 790] is **DENIED**.

3.    Defendants Erie Custom Computer Applications, Inc. and Payroll World,

Inc.'s  Amended Motion for Attorney Fees [ECF No. 811] is **DENIED**.

4.    Defendants Kevin Clayton, PayDay USA, Inc., Proliant Technologies, Inc.,

and Proliant, Inc.'s Amended Motion for Attorney Fees [ECF No. 836] is **GRANTED** in

part and Plaintiff MPAY, Inc. shall pay these defendants' attorney's fees in the amount of

$823,660.94.


Dated:  December 21, 2022                          s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court